FILED'08 APR 07 12:44USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARTIN E. MURRELL,                          Civil No. 06-97-AA
Personal Representative of the                OPINION AND ORDER
Estate of ELFRIEDE MARIA MURRELL,
deceased,

         Plaintiff,

    vs.


UNION PACIFIC RAILROAD COMPANY,
NATIONAL PASSENGER RAILROAD CORPORATION
dba AMTRAK, GEORGE M. LANDROCK, CRAIG E.
BILLINGS, JOHN DOE ONE, and CITY OF SALEM,

         Defendants.
_____

J. Randolph Pickett
R. Brendan Dummigan
Picket Dummigan Aguilar LLP
621 S.W. Morrison Street, Suite 900
Portland, OR 97205
     Attorneys for Plaintiff

James L. Hiller
Hitt Hiller Monfils Williams LLP
411 S.W. Second Avenue, Suite 400
Portland, OR 97204
     Attorney for Defendants,

Union Pacific Railroad Company,
National Passenger Railroad Corporation
dba Amtrak, George M. Landrock, and
Craig E. Billings

Aaron D. Felton
City of Salem Legal Department
555 Liberty SE, Rm. 205
Salem, OR 97301
    Attorney for Defendant,
    City of Salem

AIKEN, Judge:

Pending before the court are three separate motions: two
motions for summary judgment made by (1) the Union Pacific
Railroad Company ("Union Pacific"), National Passenger Railroad
Corporation dba Amtrak ("Amtrak"), George M. Landrock
("Landrock"), and Craig E. Billings ("Billings") (collectively,
"railroad defendants"); and (2) the City of Salem ("City"); and
(3) a separate motion to strike filed by railroad defendants.  On
March 31, 2008, the court held oral argument on these motions.
Railroad defendants' motions are granted in part and denied in
part. Defendant City's motion is granted.

In this action, plaintiff claims negligence and wrongful
death.  Pursuant to Fed. R. Civ. P. 56, railroad defendants move
for an order granting summary judgment for each defendant on all
of plaintiff's claims.  Railroad defendants' alternatively move
for an order granting each defendant summary judgment as to each
specification of negligence asserted by plaintiff.  Defendant
City, a public body, also moves for summary judgment.  Defendant

City argues that plaintiff's amended complaint fails to adequately set forth a basis for subject matter jurisdiction as required by Fed. R. Civ. P. 8(a), that plaintiff's claims are preempted by federal or state law, and that defendant is immune from liability based on state common law tort defenses.

BACKGROUND

On June 28, 2004, Elfriede Maria Murrell, plaintiff's decedent, was walking in a westerly direction on the sidewalk located on the north side of Chemeketa Street, N.E., approaching the intersection of 12th Street, N.E., in the city of Salem. When she crossed the railroad tracks she was struck and killed by an Amtrak train. Plaintiff and defendants dispute whether the decedent was aware that the train was approaching the intersection.

The railroad crossing ("the Crossing") is used, owned, or regulated by defendants Union Pacific, Oregon Department of Transportation, and the City. Union Pacific assumed ownership and control of the tracks at the Crossing on September 11, 1996. However, Union Pacific does not maintain the roadways at grade crossings. Any construction or maintenance performed by Union Pacific at the Crossing was done at the direction of the Oregon Department of Transportation ("ODOT"). The Crossing is identified in the federal crossing inventory as United States Department of Transportation ("USDOT") No. 759670S. There are

Page 3 - OPINION AND ORDER

two vehicle gates, two warning bells, and two mast mounted flashing lights at the Crossing. These vehicular warning devices were all operational at the time of the incident.

In addition, there is a pedestrian control device which is visible to pedestrians traveling in a westerly direction on the north sidewalk of Chemeketa Street, that is located on the west side of 12th Street, across the railroad tracks, and across 12th street. This pedestrian control device indicates "DON'T WALK" when the automatic gates and flashing warning lights are activated to stop vehicular traffic traveling on Chemeketa Street. The crossing protection devices were paid for, in part, using 23 U.S.C. ~ 130 federal funding as ordered by the Oregon Public Utility Commission ("PUC"), Order No. 89-408, on March 24, 1989.

Although such protection devices were installed and functioning correctly, a number of fatalities have nevertheless occurred along the 12th Street Rail corridor. As a result, beginning in 1999, a plan was initiated and developed between the City of Salem, the Oregon Department of Transportation, and other groups to address this issue. Designs were developed to increase safety for pedestrians, including the one which ultimately was constructed as a safety rail along 12th Street. The safety rail is a solid structure which runs parallel to 12th Street with

openings where pedestrians and bicyclists can cross the street over the railroad tracks.  The State of Oregon acted as the ruling regulatory authority over the safety rail project while federal funds were used to construct it.

Nonetheless, the decedent was struck and killed by the Amtrak train as she approached the Crossing.  The event recorder on the train locomotive shows engineer Landrock sounding the train's horn continuously for 4.9 seconds immediately before and as the train struck the decedent.  In addition, the train horn sounded nearly continuously for the entire 335 feet between the Center Street crossing and Chemeketa Street crossing.  The event recorder also shows the train was traveling at 37.4 miles per hour ("m.p.h.") at or just before the time of the incident.

Railroad defendants argue the 'maximum allowable operating speed' for passenger trains traveling on a track classified as Class 3, as here, is 60 m.p.h.  49 C.F.R. ~ 213.9.  Although railroad defendants contend this federal regulation predominates other railroad internal rules for speed limits, the defendants agree that the maximum allowable timetable speed set by Union Pacific through the Crossing was 35 m.p.h.  Even so, defendants assert the 37.4 m.p.h. recorded speed was well within the federal parameters, as set forth in 49 C.F.R. ~ 219.117(a).  Plaintiff argues, however, 49 C.F.R. ~ 219.117(a) simply sets forth calibration requirements for speed indicators and does not

authorize train operators to exceed the maximum timetable speed
limit, as alleged by the railroad defendants.    Nonetheless,
plaintiff also asserts the U.S. Department of Transportation
Crossing Inventory Report indicates a maximum timetable speed of
20 m.p.h.

Railroad defendants also argue that there was no reason to
stop or slow the train when Landrock saw the decedent because
there was nothing unusual about her walking towards the Crossing;
in fact, they assert that nearly all such pedestrians will stop
for a train as they near a crossing.    They contend it would have
been unsafe for Landrock to make an emergency application of the
brakes in response to seeing the decedent walking towards the
Crossing, since it would endanger the crew and passengers on
train.    Plaintiff disputes defendants' argument that there was no
reason to at least slow down the train when Mr. Landrock saw the
decedent.

On December 15, 2005, plaintiff first filed his complaint in
Marion County Circuit Court alleging wrongful death and
negligence.    Plaintiff alleges the decedent's death was caused,
enhanced, or contributed to the negligence of defendants Union
Pacific, Landrock (the engineer), Billings (the conductor),
Amtrak, John Doe One (the Union Pacific railroad track supervisor
in charge of inspecting and maintenance of the Crossing prior to
June 28, 2004), and the City in a number of different ways.    See

First Amended Complaint, pp. 7-11.  On January 23, 2006,
defendants removed the case to this court.  28 U.S.C. §§ 1331,
1349 and 1441.

STANDARDS

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c).  Substantive law on an issue determines the materiality of
a fact.  T.W. Electrical Service, Inc. v. Pacific Electrical
Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987).  Whether
the evidence is such that a reasonable jury could return a
verdict for the nonmoving party determines the authenticity of a
dispute.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

The moving party has the burden of establishing the absence
of a genuine issue of material fact.  Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).  If the moving party shows the absence
of a genuine issue of material fact, the nonmoving party must go
beyond the pleadings and identify facts which show a genuine
issue for trial.  Id. at 324.

Special rules of construction apply when evaluating summary
judgment motions: (1) all reasonable doubts as to the existence

of genuine issues of material fact should be resolved against the
moving party; and (2) all inferences to be drawn from the
underlying facts must be viewed in the light most favorable to
the nonmoving party. T.W. Electrical, 809 F.2d at 630.

DISCUSSION

Plaintiff alleges state law negligence claims against
railroad defendants on various grounds. See First Amended
Complaint, pp. 7-11. Railroad defendants move this court for an
order granting each defendant summary judgment on all of
plaintiff's claims. In its motion, railroad defendants contend
plaintiff's state tort law claims are precluded by the Federal
Railroad Safety Act ("FRSA") and the regulations promulgated
thereunder. Railroad defendants argue that the following
plaintiff's claims are preempted by FRSA: (1) warning devices
protecting the crossing were inadequate; (2) failure to warn; (3)
failure to provide adequate visibility; (4) train operating at
excessive speeds; (5) failure to issue a slow order; (6) failure
to eliminate a dangerous condition; and (7) train operator's
failure to keep a proper lookout. Memo. in Supp. of Railroad
Defendants' Mot. for Summary Judgment, pp. 12-16, 19-28. In
addition, railroad defendants argue FRSA's "local safety hazard"
exception, 49 U.S.C. ~ 20106(a)(2)(A), does not apply in this
case. Id. at 16-28. Railroad defendants' alternatively move for
an order granting each defendant summary judgment as to each

specification of negligence asserted by plaintiff.  Finally, defendant City moves to dismiss plaintiff's complaint for lack of subject matter jurisdiction, federal and state preemption, and discretionary immunity.

Railroad defendants first assert that this case is similar to a case that was brought before Judge Mary Mertens James in Marion County.  On August 7, 2007, Judge James granted defendant Union Pacific's summary judgment motion.  Bedolla v. Union Pacific Railroad, et al., State of Oregon, Marion County Case No. 05C21805.  Judge James agreed with defendants who argued that plaintiff's negligence claims relating to the adequacy of the warning devices, the defendant's speed, and the failure to issue a "slow order" were all preempted by FRSA.  However, Bedolla was decided without mention of Congress' amendment to FRSA's preemption clause.  As such, I decline to follow Bedolla. Defendants next argue plaintiff's common law tort claims are preempted by federal law, pursuant to 49 U.S.C. ~ 20106.

Plaintiff argues its common law claims are no longer preempted based on Congress' amendment to section 20106.  In addition, plaintiff asserts defendants had a common law duty to maintain a reasonably safe crossing, the Salem Rail Corridor constituted a "specific, individual hazard," and questions of fact exist as to plaintiff's claims that railroad defendants failed to maintain a proper lookout.

1.  Federal Preemption Law

    A. Overview of Congress' Clarification of Section 20106

    In 1970, Congress enacted the FRSA with the purpose of promoting "safety in every area of railroad operations and reduc[ing] railroad-related accidents and incidents." 49 U.S.C. ~ 20101. The FRSA grants the Secretary of Transportation broad authority to "prescribe regulations and issue orders for every area of railroad safety." Id. ~ 20103(a). The FRSA also contains an express preemption provision which displaces the state's authority to regulate railroad safety when the Secretary of Transportation "prescribes a regulation or issues an order covering the subject matter of the State requirement." Id. ~ 20106(a)(1)-(2). A state may adopt a more stringent requirement as long as it "(A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce." Id. ~ 20106(a)(2). On August 3, 2007, however, Congress clarified its position regarding state law causes of action and FRSA's preemptive effect:

    (b) Clarification regarding State law causes of action.

        (1)Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property alleging that a party -

        (A) has failed to comply with the Federal standard of

care established by a regulation or order issued by the
Secretary of Transportation (with respect to railroad
safety matters), or the Secretary of Homeland Security
(with respect to railroad security matters), covering
the subject matter as provided in subsection (a) of
this section;

(B) has failed to comply with its own plan, rule, or
standard that it created pursuant to a regulation or
order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation,
or order that is not incompatible with subsection
(a)(2).

(2) This subsection shall apply to all pending State law
causes of action arising from events or activities
occurring on or after January 18, 2002.

(c) Jurisdiction. Nothing in this section creates a Federal
cause of action on behalf of an injured party or confers
Federal question jurisdiction for such State law causes of
action.

Id. ~~ 20106(b)-(c).

Subsection (b) was enacted in response to and to "rectify"
the Federal court decisions in Mehl v. Canadian Pac. Ry. Ltd.,
417 F. Supp. 2d 1104 (D. N.D. 2006) and Lundeen v. Canadian Pac.
Ry. Co., 447 F.3d 606 (8th Cir. 2006).  In both cases, the courts
concluded state law negligence claims were preempted by FRSA even
though defendant railroads failed to comply with the applicable
federal regulation or rule.  See Mehl, 417 F. Supp. 2d at 1108;
Lundeen, 447 F.3d at 611.  These decisions raised great concern
among Congressional members who believed denying accident victims
legal recourse even when the railroad violated applicable federal
regulations was inconsistent with FRSA.  As a result, Congress

amended FRSA's preemption clause by allowing state tort law claims to proceed if a railroad did not comply with a railroad safety federal regulation even if such regulation covered the subject matter of the state requirement.

To date, only three federal district courts have commented on this new provision. In Crabbe v. Consol. Rail Corp., No. 06-12622, 2007 U.S. Dist. LEXIS 80895 (E.D. Mich. November 1, 2007), plaintiff, a former car inspector working in defendant's railyard, brought a lawsuit pursuant to the Federal Employer's Liability Act ("FELA)", 45 U.S.C. ~~ 51-60, alleging job-related injuries. Defendant's sole argument was that plaintiff's FELA claim was preempted by FRSA. Id. at *2. Among other findings, the court found that 49 U.S.C. ~ 20106(b) did not apply because plaintiff did not allege that defendant failed to comply with a federal regulation. Although the court granted defendant's motion for summary judgment as to plaintiff's FELA claim, the court did not dismiss plaintiff's complaint entirely since defendant did not move on plaintiff's common law negligence claims.

In Hunter v. Candian Pac. Ry. Ltd., No. 07-3314, 2007 U.S. Dist. LEXIS 85110 (E.D. Minn. November 16, 2007), plaintiffs commenced a wrongful-death and survival action against railroad defendants that originated in state court, and later removed to federal court. Plaintiffs moved to remand arguing the case was

improperly removed partially because the doctrine of "complete preemption"[1] did not apply. Id. at *1. Plaintiffs had brought state law negligence claims against defendants including: "(a) the train was operat[ing] at excessive speed, (b) the train operators failed to keep a proper lookout, (c) the train operators failed to slow the train down when they saw, or should have seen, a vehicle approaching the crossing, (d) the train operators failed to utilize a warning device properly, and (e) signs markings and warning devices protecting the crossing were inadequate." Id. at *11. The defendants argued the federal court had federal question jurisdiction because plaintiffs' claims were preempted by federal law pursuant to the FRSA and regulations promulgated thereunder.

The court, however, cited to Congress' clarification, adopted on August 3, 2007, that states: "nothing in [49 U.S.C. ~ 20106] creates a federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action." 49 U.S.C. ~ 20106(c); Hunter, 2007 U.S. Dist. LEXIS 85110 at *19. As such, the court granted plaintiffs' motion to remand since the court did not have jurisdiction. In addition, the court concluded that it was up to the state court to decide whether the affirmative defense of preemption applied in this case. Hunter, 2007 U.S. Dist. LEXIS 85110 at *18.

Finally, in Plasser Am. Corp. v. Burlington Northern & Sante

Page 13 - OPINION AND ORDER

Fe Ry. Co., No. 06-95, 2007 U.S. Dist. LEXIS 91910 (E.D. Ark.
December 14, 2007), plaintiff brought suit against defendants
alleging negligence and breach of contract.    Plaintiff had
entered into a contract with defendant Burlington Northern
whereby plaintiff would provide ballast undercutting services for
railroad tracks.    Id. at *2.    A ballast undercutter, owned by
plaintiff and under control of Burlington Northern, derailed as
it was being transported from one job site to another, causing
damage to the undercutter in the process.    Id. at *3.
Plaintiff's negligence claim was preempted by a federal
regulation, C.F.R. ~ 216.63, that covered the same subject matter
as Arkansas negligence law pertaining to rail elevation.    Id. at
*6-8.   However, the court did not explain whether the defendant
had complied with the relevant federal regulation.

   B. Plaintiff's Claims

   Plaintiff here relies on subsection (b)(1)(C) of 49 U.S.C. ~
20106 to argue that its common state law tort claims are no
longer preempted by federal law and that the U.S. Supreme Court's
decisions in CXS Transp., Inc v. Easterwood, 507 U.S. 658 (1993)
and Norfolk S. Ry. Co. v. Shanklin, 529 U.S. 344 (2000), are
overruled.

   Plaintiff first contends this new subsection is not a
restatement of subsection (a)(2) because Congress is presumed to
pass laws that have meaning.    Plaintiff cites to TRW Inc. v.

Andrews, 534 U.S. 19 (2001), which states:
>    It is a cardinal principle of statutory constructions
>    that a statute ought, upon the whole, to be construed that,
>    if it can be prevented, no clause, sentence or word shall be
>    superfluous, void, or insignificant.

Plaintiff argues that new subsection (b)(1)(C) restricts state law negligence claims from being preempted that are different or more stringent than the pertinent federal standard.  Plaintiff contends his common law claims should survive preemption because those claims relate to crossing safety for pedestrians, as opposed to operators of motor vehicles, which is not addressed by federal regulations.

I disagree.  I find plaintiff's assertion that the federal regulations are different or, alternatively, do not "cover the subject matter" of its common law claims is not persuasive. Plaintiff's state law claim would survive section 20106(a)(2) even without Congress' recent clarification if these state law claims were different from any federal regulation.  However, I agree with defendants who argue 23 C.F.R. ~~ 646.214(b)(3) and (4), which preempts state law tort claims concerning a railroad's failure to maintain adequate warning devices where federal funds financed the installation of such devices, do not distinguish between pedestrians and motorized traffic.

There are a number of railroad crossings in Oregon and elsewhere in the nation that are regularly crossed by persons on foot.  Only one court has ruled on whether such provisions

Page 15 - OPINION AND ORDER

subsume common law tort claims for actions brought by a
pedestrian. In Thomas v. Burlington N. Sante Fe Corp., 2007 U.S.
Dist. LEXIS 53218 (E.D. Cal. July 12, 2007), the court granted
summary judgment for defendant on plaintiff's negligence claim
finding the railroad negligent in failing to erect pedestrian
rails to protect the plaintiff's son from being hit by a train as
he crossed the tracks at a crossing. In addition, the catch-all
provision of 23 C.F.R. ~ 646.214(b)(4) would address a
distinction, if one existed, if the type of warning device
depended on the mode of transportation.

In addition, plaintiff does concede the U.S. Supreme Court
has held in the past that the word "law" as used in subsection
(a) includes state tort causes of action. Cipollone v. Liggett
Group, Inc., 505 U.S. 504, 522 (1992). In addition, plaintiff
concedes this interpretation supported the Supreme Court's
decision in Shanklin which held common law negligence claims are
preempted since they are state law claims. See also Easterwood,
507 U.S. at 664 ("[l]egal duties imposed on railroad by the
common law fall within the scope of these broad phases [of
preemption]"). Plaintiff, however, argues Easterwood and
Shanklin were overruled by Congress' amendment.

I disagree. I first hold the amendment to section 20106,
specifically subsection (b)(1)(C), as reaffirming state law
preemption whenever the Secretary of Transportation issues a

regulation or order covering the subject matter of railroad safety or railroad security, unless one of the exceptions apply in subsection (a)(2).  Subsection (b)(1)(C) was presumably added to be consistent with subpart (a).  In addition, as mentioned before, and as the legislative history suggests, section 20106 was amended in part because of the federal court decisions related to the Minot, North Dakota accident.  See H.R. Rep. No. 110-259, 110th Cong., at 351 (2007).

Therefore, nothing in the amendment or the legislative history states common law tort claims are preempted except within the exceptions listed in subsection (a)(2).  The changes made in section 20106 will be memorialized in new federal regulations taking effect on April 14, 2008.  See Railroad Operating Rules, 73 Fed. Reg. 8442 (February 13, 2008) (to be codified at 49 C.F.R. ~~ 217.2 and 218.4).  This final rule makes clear that "[i]n general, 49 U.S.C. 20106 will preempt any State law - whether statutory or common law - and any State regulation, rule, or order, that concerns the same subject matter as the regulations in this rule."  Id. at 8456 (emphasis added) (internal citations omitted).

Second, the clarification to section 20106 did not explicitly overrule the decisions in Shanklin and Easterwood. The changes made in section 20106 did modify, though, the approach courts take when analyzing whether state law is

preempted by federal law.  Before such changes, non-compliance
with federal regulations or rules created pursuant to a federal
regulation need not be taken into account to determine whether
state law was preempted by federal law.  <u>Shanklin</u>, 529 U.S. at
357-58.  Further, there was no need to inquire into the purpose
of the regulation or rule.  <u>Easterwood</u>, 507 U.S. at 675.  In that
regard, <u>Shanklin</u> and <u>Easterwood</u> should not be relied on.
However, the amendment to section 20106 did not change the
findings that common law negligence claims would be preempted by
federal law as long as such state law claims are covered by
federal regulations pursuant to section 20106.  Therefore, the
Court's decision in <u>Shanklin</u> which held that common law
negligence claims are preempted continues to stand today as long
as the defendant complies with the requirements listed in section
20106(b)(1).

    Further, plaintiff incorrectly argues that <u>Hunter</u> held that
the plaintiff's claims, in that case, of excessive speed and
inadequate warnings were the type of state law claims that were
not subject to preemption.  Plaintiff's Memo. in Opposition, p.
10.  However, the court stated, on remand, it was up to the state
court to rule on the affirmative defense of preemption on the
merits.  <u>Hunter</u>, 2007 U.S. Dist. Lexis 85110 at *18.  Thus, the
issue in <u>Hunter</u> was not whether plaintiff's claims should be
preempted but whether the court had federal court jurisdiction.

Congress' amendment to section 20106 did limit some state law tort claims from being preempted by federal law, specifically when a party has failed to comply with a federal standard of care established by a federal regulation or order or when it has failed to comply with is own plan, rule or standard.  However, new subsection (b)(1)(C) did not provide for all state law tort claims from being preempted by federal law as plaintiff seems to suggest.

2. Negligence Claims

A. Excessive Speed

Railroad defendants contend plaintiff's claims that the train's speed was excessive are preempted by federal law. Amended complaint, ~~ 14(c), 18(f), 19(b), 20(b).  Plaintiff first argues that his excessive speed claims are not preempted because defendants fail to comply with its own rules, as required by 49 U.S.C. ~ 20106(b)(1)(B).  Plaintiff contends the maximum timetable speed is 20 m.p.h. pursuant to the U.S. Department of Transportation's Crossing Inventory Report for this crossing. See Plaintiff's Memo. in Opposition, Ex. E.  Alternatively, plaintiff indicates the timetable references provided in discovery set a maximum speed of 35 m.p.h. for this crossing. See Decl., Hiller, Ex. 6.  Whether the maximum speed is 20 or 35 m.p.h., plaintiff argues railroad defendants failed to comply with maximum speed limits when the train sped at 37.4 m.p.h., as

recorded by the event recorder, just prior to the incident. Railroad defendants argue: (1) the maximum allowable operating speed for passenger trains on Class 3 tracks, as was this one, is 60 m.p.h. pursuant to 49 C.F.R. ~ 213.9; and (2) even if the maximum speed limit was 35 m.p.h., 49 C.F.R. ~ 229.117(a) authorizes speeding beyond the set speed limit within certain parameters.   Railroad defendants also rely on Easterwood which held that under the FRSA, federal regulations pre-empted plaintiff's negligence action only insofar as it asserted that defendant's train was traveling at an excessive speed.   507 U.S. at 673-76.

On August 8, 1985, the Oregon Public Utility Commission ("PUC") entered Order No. 85-708 which authorized Southern Pacific to operate its train at certain grade crossings in Salem (including this crossing) at speeds up to 35 m.p.h. upon satisfaction of certain requirements.   On December 2, 1992, PUC entered Order No. 92-1689 which stated that all conditions for operation of trains at speeds up to 35 m.p.h. had been met.   No PUC order amending the permitted speed appears in the record. Also, at the time of the accident, no slow orders had been issued for the crossing that would have decreased the maximum allowable speed.   Therefore, pursuant to a state order, the maximum allowable speed through the crossing at the time of the collision was 35 m.p.h.   Railroad defendants argue that section 229.117

authorizes trains to exceed 35 m.p.h. at the Crossing within

certain parameters.  Section 229.117 states:

>(a) After December 31, 1980, each locomotive used as a
>controlling locomotive at speeds in excess of 20 miles per
>hour shall be equipped with a speed indicator which is--
>
>>(1) Accurate within +/-3 miles per hour of actual speed
>>at speeds of 10 to 30 miles per hour and accurate
>>within +/-5 miles per hour at speeds above 30 miles per
>>hour; and
>>
>>(2) Clearly readable from the engineer's normal
>>position under all light conditions.
>
>(b) Each speed indicator required shall be tested as soon as
>possible after departure by means of speed test sections or
>equivalent procedures.

Plaintiff argues that this section pertains only to

sensitivity, accuracy, and calibration of the train's speedometer

and is not relevant to determine whether a train is in compliance

with maximum timetable speed limits.  I agree.  Based on the

plain language of the regulation, there is nothing to suggest

that a train conductor would be allowed to maintain speeds in

excess of the maximum timetable speed limit.  Section 229.117(b)

simply implies that speed indicators should be fairly accurate

since they should be tested after each departure.

Railroad defendants assert alternatively that these

timetables are internal rules that are not required by any

federal regulation, not required by the Secretary, do not embody

a federal standard of care, and thus do not fall within the

exception listed under 49 U.S.C. ~ 20106(b)(1)(B).  Pursuant to

Union Pacific's timetable and Oregon PUC's order, the maximum allowable speed was set at 35 m.p.h. at the Crossing. Although railroad defendants admit the stated timetable speed for the track within the Salem Corridor is 35 m.p.h, they argue Union Pacific's rule was not created pursuant to the speed limit regulations originally issued by the Secretary. Railroad defendants' Reply, p. 3. See also Decl. of Heikkila, ~ 10; Supp. Decl. of Fennewald, Ex. 12 (timetable shows the maximum speed limit for the Crossing, located between mileposts 716.5 and 720.3, as being 35 m.p.h.)

Although violations of Union Pacific's own speed regulations may be evidence of negligence in state court, such regulations are preempted by federal law. Michael v. Norfolk S. Ry. Co., 74 F.3d 271, 273 (11th Cir. 1996). Federal regulations, which specify speed limits for different types of tracks and trains, are not affected by internal railroad policies. Id. at 273-74. See also St. Louis Sw. Ry. Co. v. Pierce, 68 F.3d 276, 278 (8th Cir. 1995). The U.S. Supreme Court in Easterwood verified that Part 213 of the code of federal regulations preempts local speed laws. 507 U.S. 658 (1993).

Plaintiff, in oral argument, relies on Anderson v. Wisconsin Cent. Transp. Co. to hold that railroad-designated speed limits set in their timetables and train orders must be complied with notwithstanding speed limits set pursuant to federal regulations

in part 213.  327 F.Supp.2d 969 (E.D. Wis. 2004).  However, the
court in Anderson was attempting to determine the classification
of the track depending on the timetable speed set by the railroad
and whether any speed restrictions or slow orders had been issued
by an FRA or state track inspector.  Once railroads identify
desirable speeds for particular stretches of track, they must
maintain the track so as to satisfy FRA standards for the class
of track corresponding to that train speed or be subject to a
penalty.  See Track Safety Standards, 63 Fed. Reg. 33992, 33998
(June 22, 1998).[2]

      In Anderson, if no speed restrictions were deemed to be
issued, a timetable speed of thirty-five miles per hour would
stand as the speed at the crossing and thus would correspond to a
class three track for freight trains. 327 F.Supp.2d at 977.  The
court determined it was unclear whether any speed restrictions
were in effect at the time of the accident, and therefore, the
classification of the track was a triable issue of fact.  Id.

      Here, there is no issue that the Crossing had a class three
classification for passenger trains.  Plaintiff does not claim a
speed restriction or a "slow order" was issued by an FRA or state
track inspector.  Thus, the timetable speed of 35 m.p.h. set by
Union Pacific meant Union Pacific must maintain the track at the
crossing up to classification three FRA standards, including the
class three speed limits for passenger trains.  Plaintiff does

not argue railroad defendants did not meet class three standards for passenger trains. Since the classification was not lowered to class two, federal preemption is still applicable in this case.

In addition, I agree that Union Pacific's maximum timetable speed limits were internal rules that were not "created pursuant to a [federal regulation] or order issued by either of the Secretaries." 49 U.S.C. ~ 20106(b)(1)(B). Plaintiff does not cite to any federal regulation or order for setting the timetable speed of 35 m.p.h. for this crossing.

Plaintiff does argue correctly that railroads, and not FRA, are responsible for identifying appropriate speeds for certain stretches of a track. However, even though FRA has never assumed the task of classifying particular segments of track and train speeds, the FRA has maintained that the "[p]revention of grading crossing accidents is more effectively achieved through the use of adequate crossing warning systems and through observance by the traveling public of crossing restrictions and precautions." 63 Fed. Reg. at 33999. FRA also believes measures that implement regulations for maintenance, inspecting and testing of warning devices at crossings, such as lights and gates, are "more effective approaches to enhancing safety at grade crossings than an attempt to design speed limits for each geographic situation." Id.

Page 24 - OPINION AND ORDER

As such, plaintiff's common law tort claims relating to the train's speed are preempted.  Therefore, railroad defendants' motion for summary judgment regarding plaintiff's negligence claim for excessive speed is granted unless I find below there exists a specific, individual hazard pursuant to 49 U.S.C. ~ 20106(a)(2)(A).

B. <u>Failure to Issue a Slow Order</u>

Railroad defendants also seek summary judgment on plaintiff's negligence claim arguing that defendants failed to issue a "slow order."  Defendants contend those claims are preempted by federal law.  Amended complaint, ~~ 18(f), 19(c), 20(c), 21(a).  Railroad defendants concede railroads have a duty to issue a slow order under certain circumstances under the FRSA.  For instance, they argue that passing trains must slow their speed to 15 m.p.h. if warning signals have been falsely activated, pursuant to 49 C.F.R. ~ 234.107(c)(2).  In addition, a FRA track inspector may downgrade a track segment which does not meet the requirements of a particular class to the next lowest class until the requirements are met.  <u>Id.</u> ~ 213.9(b).

Railroad defendants assert the tracks were inspected by the FRA inspector before the accident and found to comply with the Class 3 requirements.  Further, railroad defendants contend a failure to issue a "slow order" claim is preempted unless there exists a specific, individual hazard.  Moreover, they argue that

a "slow order" claim is synonymous with a claim for excessive
speed and therefore should be preempted on that basis alone.

Although the Court in Easterwood found that excessive speed
claims are preempted, the Court noted "related tort law duties,
such as the duty to slow or stop a train to avoid a specific,
individual hazard" might not be preempted.  507 U.S. at 675 n.15.
A railroad has a duty to issue a slow order under certain
circumstances, none of which are alleged to have existed during
the time of the accident.

Federal law leaves the decision to issue a "slow order" to a
FRA inspector, as designated by the requirements set forth in 49
C.F.R. ~ 213.7.  For instance, passing trains must slow their
speed to 15 m.p.h. if warning signals have been falsely
activated, unless an appropriately equipped flagger or a
uniformed law enforcement officer is providing warnings at the
crossing.  See 49 C.F.R. ~ 234.107(c)(2).  In addition, a FRA
track inspector may downgrade a track segment which does not meet
the requirements of a particular class to the next lowest class,
and subsequently a lower speed, for which it does meet all of the
requirements, until the requirements for the original class are
met.  Id. ~ 213.9(b).  When the FRA track inspector "determines
the track does not comply with the requirements of the class at
which the track is being operated *** he notifies the railroad in
writing that the track is being lowered in class[.]"  Id. ~

216.15(a).  I also find that slow order limits are covered by

federal law by the following federal regulation:

> (a) After August 1, 1977, each railroad must have in effect an operating rule which complies with the requirements set forth below:
>
>> (1) Except as provided in paragraph (a)(2) of this section, flag protection shall be provided -
>>
>>> (I) When a train is moving on the main track at less than one-half the maximum authorized speed (including slow order limits) in that territory, flag protection against following trains on the same track must be provided by a crew member by dropping off single lighted fusees at intervals that do not exceed the burning time of the fusee.

49 C.F.R. ~ 218.37.

Railroad defendants argue the tracks had been inspected by

the FRA inspector before the accident, as required by 49 C.F.R. ~

213.241, and found to comply with the Class 3 requirements.

Plaintiff does not dispute this claim.  Thus, I find that

plaintiff's negligence claim regarding a "slow order" is covered

by federal law and is thus preempted by federal law.

Accordingly, railroad defendants' motion for summary judgment on

plaintiff's negligence claim for failing to issue a "slow order"

is granted unless I find below there exists a specific,

individual hazard pursuant to 49 U.S.C. ~ 20106(a)(2)(A).

C. Inadequate Warning Devices

Defendants argue that plaintiff's claims that the warning

devices at the crossing were inadequate are preempted.  Amended

complaint, ~~ 14(e), 14(f), 18(a), 18(d), 18(e), 18(g), 25(e) and

(d). Defendants rely on case law holding that 23 C.F.R. ~~ 646.214(b)(3)[3] and (4)[4] preempt state law claims for failure to maintain adequate warning devices at railroad crossings where federal funds were used to improve the crossing at issue. See Shanklin, 529 U.S. at 352; Union Pac. R.R. Co. v. California Pub. Utilis. Comm'n, 346 F.3d 851, 865 (9th Cir. 2003). It is not disputed that federal funds were used to install the warning devices. See Memo in Support of Railroad Def.'s Motion for Summary Judgment, Ex. 4 (Decl. Hiller) (Oregon Public Utilities Commission Order No. 89-408, March 24, 1989). Upon finding that Shanklin was not overruled by Congress' clarification to section 20106, I now hold plaintiff's inadequate warning devices claim is preempted by federal law. Thus, railroad defendants' alternative argument that plaintiff's negligence claims are preempted by state law is moot.[5]

Accordingly, defendants' motion for summary judgment on plaintiff's negligence claim of inadequate warning devices at the crossing is granted unless I find below there exists a specific, individual hazard pursuant to 49 U.S.C. ~ 20106(a)(2)(A).

D. Failure to Warn

Defendants next argue that plaintiff's failure to warn claims against Union Pacific are preempted. Amended complaint, ~~ 14(f), 18(b), 25(b). Defendants again cite to Shanklin to support the proposition that defendants do not have a duty to

warn motorists or pedestrians of oncoming trains if FHWA has funded the crossing improvement and the warning devices are actually installed and operating.  529 U.S. at 353.

Plaintiff's failure to warn claim is synonymous with its claim for inadequate devices.  The crossing improvements and warning devices at this crossing were made with federal funding and in accordance with 23 C.F.R. ~~ 646.214(b)(3) and (4).  These federal regulations cover the subject matter of plaintiff's failure to warn claim.  As such, these regulations set the standards for whether warning devices are adequate.  Once these protective devices are installed with federal funding and are operating correctly, any state claims against a railroad are preempted.  See Lee v. Burlington N. Sante Fe Ry. Co., 245 F.3d 1102, 1106 (9th Cir. 2001).  The evidence shows that these devices were financed with federal funding and were functioning correctly.  Therefore, I find plaintiff's claim that Union Pacific failed to warn the public of the conditions at the crossing is preempted pursuant to 49 U.S.C. ~ 20106. Accordingly, defendants' motion for summary judgment on plaintiff's negligence claim for failing to warn is granted unless I find below there exists a specific, individual hazard pursuant to 49 U.S.C. ~ 20106(a)(2)(A).

E. Inadequate Visibility

Defendants further argue that plaintiff's claim for failing

to provide adequate visibility is preempted by federal law.
Amended complaint, ~~ 14(g), 18(c) and (h) and 25(g).  Defendants
assert that limited sight distance for pedestrians, motorists, or
train operators does not preclude preemption of common law
negligence claims as long as federal funding is used to finance
the crossing.  Further, defendants contend preemption applies if
general conditions of crossings do not obscure or interfere with
devices signaling the crossing.  Further, defendants contend
plaintiff's claim is not a specific, individual hazard and is
thus preempted.

These claims are similar to plaintiff's inadequate warning
devices claim.  In particular, plaintiff's inadequate "sight
triangles" claim could be argued to be covered and preempted by
23 U.S.C. ~ 646.214(b)(3)(I) which states:
    Adequate warning devices, under § 646.214(b)(2) or on any
    project where Federal-aid funds participate in the
    installation of the devices are to include automatic gates
    with flashing light signals when one or more of the
    following conditions exist: ...

        (C) High Speed train operation combined with limited
        sight distance at either single or multiple track
        crossings.

        . . .

        (E) Either a high volume of vehicular traffic, high
        number of train movements, substantial numbers of
        schoolbuses or trucks carrying hazardous materials,
        unusually restricted sight distance, continuing accident
        occurrences, or any combination of these conditions

(emphases added).

Page 30 - OPINION AND ORDER

However, these regulations govern warning signals, and not other visual impediments and, thus, this argument takes the regulation's language out of context. Further, this regulation does "not define the terms 'limited' or 'unusually restricted' sight distance, indicate that any sight distance obstructions should be removed, set standards as to how much sight distance should be provided, set standards as to how much sight distance should be provided to [pedestrians] approaching a grade crossing, contain any guidelines relating to the railroad's obligation to maintain its grade crossings, or even mention 'vegetation' or 'right of way.'" Shanklin v. Norfolk S. Ry. Co., 369 F.3d 978, 987 (6th Cir. 2004).

Although sections 646.214(b)(3) and (4) restrict plaintiff from bringing tort state law claims concerning appropriate warning devices, these "regulations do not eclipse those duties ensuring safe grade crossings that are unrelated to warning devices, such as the duty to keep visibility at grade crossings free from obstructions." Strozyk v. Norfolk S. Corp., 358 F.3d 268, 277 (3d Cir. 2004). Accordingly, since these regulations do not "cover" state common law sight distance claims, it follows that plaintiff's visibility claims are not preempted. Thus, defendants' motion for summary judgment on plaintiff's claim for failing to provide adequate visibility claim is denied.

F. Failure to Eliminate a Dangerous Condition

Plaintiff also brings a negligence claim against defendant
John Doe, Union Pacific railroad track supervisor in charge of
inspection and maintenance of the Crossing, and other railroad
defendants, for failing to eliminate a dangerous condition.
Amended complaint, ~~ 14(f), 18(a)-(c) and (g), 22, 25(a)-(c),
(f).  In regards to the 'dangerous condition,' plaintiff alleges
"[t]here was an obstruction to visibility to the north for
pedestrians traveling westbound on the north sidewalk in the form
of a large concrete barrier."  Amended Complaint, ~ 14(g).
Railroad defendants argue this claim should be preempted because
a specific, individualized hazard did not exist for this
crossing, which they state is the basis for this dangerous
condition claim.  I find that this claim is synonymous with
plaintiff's inadequate visibility claim.

Both the nature of the concrete barrier obstruction and
whether one must come dangerously close to the crossing before
being able to see the train are factual questions to be resolved
by the finders of fact.  The fact finders must determine whether
these defendants have provided ordinary care to meet the alleged
unusual conditions of this crossing, particularly where the
concrete barrier created a dangerous condition by obstructing the
decedent's view of the approaching train.  Thus, plaintiff's
failure to eliminate a dangerous condition is not preempted by
federal law.  Accordingly, defendants' motion for summary

judgment on plaintiff's failure to eliminate a dangerous condition claim is denied.

    G. <u>Failure to Keep a Proper Lookout</u>

       Finally, defendants argue plaintiff's claim that Landrock and Billings are negligent in failing to keep and maintain a proper lookout is preempted because it is redundant with plaintiff's excessive speed claim, which defendants argued previously was preempted by federal law. Amended complaint, ¶¶ 19(a) and 20(a). If this claim is not preempted, defendants assert they are entitled to summary judgment because they did not have a duty to stop the train or fail to gain complete control of it since the train operator gave a proper alarm and was entitled to assume that the decedent would heed such warnings and move to a place of safety. See <u>Andrews v. Metro N. Commuter R.R. Co.</u>, 882 F.2d 705, 709-10 (2d Cir. 1989).

    Train crews have a general duty to keep a proper lookout for motorists and pedestrians approaching a crossing before them. It is presumed that motorists and pedestrians will stop short of a crossing when a train approaches; however, a train crew has a duty to use ordinary care to prevent injury when it is apparent that such persons will not be able to move from the track when the train crosses. <u>Nye v. CSX Transp., Inc.</u>, 437 F.3d 556, 567 (6th Cir. 2005). See also <u>Espinosa v. S. Pac. Transp. Co.</u>, 50 Or. App. 561, 576 n. 17, 624 P.2d 162 (1981); <u>Brown v. Spokane</u>,

Portland and Seattle Ry. Co., 248 Or. 110, 119-20, 431 P.2d 817
(1967). To survive summary judgment, "plaintiffs have the burden
to produce some evidence, other than speculation or guesswork,
that something was present at the [crossing] to be seen by
crewmen keeping a proper lookout." Guidroz-Brault v. Missouri
Pac. R.R. Co., 254 F.3d 825, 829 (9th Cir. 2001).

Here, defendants Landrock and Billings argue they had no
reason to suspect that the decedent was unaware of a train
approaching the Crossing, especially with the gates down, lights
flashing, and the train horn blaring. Thus, defendants assert
they are entitled to summary judgment as a matter of law because
Landrock and Billings owed no duty to stop or slow down for the
decedent, who was of mature age and walked at a normal rate of
speed. Defendants argue they had no reason to believe that
plaintiff was unaware of the obvious indications that a train was
approaching the crossing at issue, that is: lights flashing and
train horn blaring.

Defendants rely on New York, New Haven & Hartford R.R. Co.
v. Henagan for the proposition that a train crew who provides
proper alarms does not have any duty to avoid a pedestrian until
it becomes apparent that the pedestrian approaching the crossing
will place him or herself in peril. 364 U.S. 441 (1960). This
case, however, decided the question of whether a railroad would
be negligent for injuries sustained by plaintiff, a waitress

working on the train, when the train applied emergency brakes. The court did not decide whether the railroad was negligent for hitting and killing a pedestrian on its tracks.

Even if Landrock had some knowledge that the decedent would not stop once he saw her, defendants assert there was nothing he could have done to avoid the accident. Defendants argue the train had a stopping distance between 535 and 600-700 feet depending on perception and reaction time and that he could not have avoided the decedent because he first saw her at a distance of only 335 feet from the train. Thus, defendants contend Landrock could not have avoided the decedent even if he had applied the emergency brakes.

Plaintiff relies on its expert who stated Landrock and Billings did not keep a proper lookout because of excessive speed, sounding the horn at a low volume, and failing to sound the horn in a certain pattern as required when faced with an impending emergency. See Plaintiff's Memo in Opp., p. 13, Ex. A (Decl. Culver), ~ 20, p. 8. Plaintiff also notes engineer Landrock's deposition in which he testified that he began "blowing the whistle a little louder" when the decedent was "maybe 10 feet" from the nearest rail. Id. at 6; Ex. F (Dep. Landrock), p. 41.

Initially, I find that this claim is not synonymous with plaintiff's excessive speed claim because train operators could

be held negligent for not maintaining a proper lookout even if
they are following specified speed limits.   Next, I find a
genuine issue of material fact exists as to whether it was
apparent that the decedent would be in danger of injury as she
approached the crossing and if so, whether the train crew had a
duty to use ordinary care to prevent such injury to her.   Thus,
defendants' motion for summary judgment on plaintiff's failure to
maintain a proper lookout claim is denied.

3. Local Safety Hazard Exception

     Even though plaintiff's negligence claims for excessive
speed, failure to issue a slow order, failure to warn, and
inadequate warning devices are preempted by federal law, these
claims may still survive summary judgment if I find there exists
an essentially local safety hazard.   See 49 U.S.C. ~
20106(a)(2)(A).

     In Union Pac. R.R. Co., the Ninth Circuit defined
"essentially local safety hazard" for the first time.   346 F.3d
at 859-60.   The court concluded that the word "essentially"
required it to inquire into the nature of the hazard itself, as
opposed to relying solely on the frequency with which a hazard
occurs, to determine whether such hazard is local in nature and
should subsequently be dealt with on the local level.   Id. at
860.   Further, the Ninth Circuit stated that its sister circuit
courts have come to a similar conclusion based on the statutory

history of the FRSA, "defining it as one which is not 'adequately encompassed within national uniform standards.'"  See Id.

In Union Pac. R.R. Co., the court found that a abnormally high derailment rate at the accident site and its steep grade/sharp curve combination, as alleged by defendant, were not sufficiently local to fall within the exception.  Id.  First, the court found the high derailment rate as not unusual because all steep grades and sharp curves in the nation increases the risk of derailment.  Id.  More importantly, the court stated that "although a high derailment rate may be evidence of an existing hazard, it says nothing about the nature of the hazard itself." Id. at 861.  The court came to the same conclusion regarding the grade/curve combination stating that there were many curves in the United States that shared the same characteristics as the one at the accident, and therefore was not a local hazard.  Id.

Plaintiff argues this case presents a "specific, individual hazard" due to the high fatality rate among pedestrians resulting from railroad accidents along the 'Salem Corridor.'  Plaintiff's Memo. in Opp., p. 13.  Further, plaintiff argues "[t]here is no other locale in Oregon with a death rate for pedestrians similar to that of Salem" and it is "not capable of being addressed by uniform national standards."  Id.

First, plaintiff fails to identify a specific hazard at the crossing.  Second, this case is similar in some respects to Union

Pac. R.R. Co.  There, plaintiff argues that a abnormally high derailment rate is an essentially local, safety hazard.  346 F.3d at 860.  Plaintiff here identifies a high fatality rate as a specific, individual hazard.  The court in Union Pac. R.R. Co. held that although a high derailment rate may be evidence of an existing hazard it says nothing about the nature of the hazard itself.  Id.  Thus, I similarly find that there was no condition that created an "essentially local safety hazard" pursuant to section 20106(a)(2)(A).

Accordingly, defendants' motions for summary judgment regarding plaintiff's negligence claims for excessive speed, failure to issue a slow order, failure to warn, and inadequate warning devices are granted.  Although a high fatality rate for this area of Salem is not considered an essentially local safety hazard, as deemed by the statute, the State of Oregon, City of Salem, and Union Pacific obviously need to take additional measures to prevent future railway-pedestrian accidents from occurring in the future.

4. City of Salem's Discretionary Immunity

Defendant City argues it is entitled to statutory discretionary immunity under the Oregon Tort Claims Act ("OTCA") on plaintiff's claims.  The OTCA provides that a public body is subject to suit for its torts and those of its officers, employees, and agents acting within the scope of their

employment.  ORS 30.265(1).  However, such bodies are immune from

liability if any claims are "based upon the performance of or the

failure to exercise or perform a discretionary function or duty,

whether or not the discretion is abused."  ORS 30.265(3).  The

defendant has the burden to establish the affirmative defense of

discretionary immunity.  John v. City of Gresham, 214 Or. App.

305, 311-12, 165 P.3d 1177 (2007); Vokoun v. City of Lake Oswego,

335 Or. 19, 31, 56 P.3d 396 (2002).  Further, the defendant must

establish each element of the defense as a matter of law to

prevail on summary judgment.  Sande v. City of Portland, 185 Or.

App. 262, 267, 59 P.3d 595 (2002).

Oregon state courts have described "discretionary immunity"

as follows:
> "Discretionary immunity applies to actions that embody 'a
> choice among alternative public policies by persons whom
> responsibility have been delegated.'  Miller v. Grants Pass
> Irrigation Dist., 297 Or. App. 312, 316, 686 P.2d 324
> (1984). This statement identifies three criteria that
> government function or duty must meet in order to qualify
> for discretionary immunity. It must be the result of a
> choice, that is, the exercise of judgment; that choice
> must involve public policy, as opposed to the routine day-
> to-day activities of public officials; and the public policy
> choice must be exercised by a body or person that has,
> either directly or by delegation, the responsibility or
> authority to make it."

Ramirez v. Hawaii T & S Enterprises, Inc., 179 Or. App. 416, 419,

39 P.3d 931 (2001) (emphasis in original).

A discretionary action requires the exercise of judgment in

order to "pursue a particular objective, a choice among different

Page 39 - OPINION AND ORDER

objectives, or a choice of means to accomplish an objective."
Ramirez, 179 Or. App. at 419 (citing McBride v. Magnuson, 282 Or.
433, 437, 578 P.2d 1259 (1978)).  For instance, a city is immune
from liability for property damage if a city's decision not to
build a particular capital improvement project, even if it would
have prevented the damage, resulted from prioritizing and
choosing among a number of different projects; however, the city
would not be immune if, having decided to build the project, it
did so negligently.  Ramirez, 179 Or. App. at 419 (internal
citation omitted).

     In addition, "a decision to build a highway rather than a
railroad in a particular location is a government policy that
cannot give rise to liability under the statute.  McComb v.
Tamlyn, 173 Or. App. 6, 12, 20 P.3d 237 (2001).  On the other
hand, many decisions in the planning and design of highways
require the exercise of some technical discretion but do not
necessarily involve governmental policy choices."  In McComb,
the plaintiff sued the state for negligence for designing signals
for an intersection; however, the state argued that it designed
the intersection in accordance with the Manual of Uniform Traffic
Control Devices ("MUTCD"), which was a policy decision.  The
Oregon Court of Appeals overruled the trial court's decision and
held that the construction of a particular intersection was not
considered a policy decision subject to immunity.  173 Or. App.

at 12-13.

Further, in John v. City of Gresham, the plaintiff sued the City of Gresham and Multnomah County for negligence for designing an intersection to include a painted crosswalk, which allegedly gave pedestrians a false sense of security. 214 Or. App. at 307. The city contended the city's transportation engineer exercised discretion in determining whether to paint the crosswalk which was based on evaluations of the overall safety design of the intersection. Id. at 313-14. Plaintiff relied on evidence that the engineer failed to exercise his judgment regarding painting the crosswalk because he deferred to the county's recommendation, and not his own independent determination. Id. at 314.

The court held that a jury could reasonably find that the city's decision was in fact not a decision at all. Id. The Oregon Supreme Court explained that discretionary immunity does not apply to decisions not to decide. Mosely v. Portland Sch. Dist. No. 1J, 315 Or. 85, 843 P.2d 415 (1992). As such, the court ruled the trial court erred in granting the city's motion for summary judgment on discretionary immunity grounds. Based on case law, the main, operative distinction between immune and non-immune actions rests on choosing a course of action or inaction, on one hand, and putting that choice into effect, on the other hand. Ramirez, 179 Or. App. at 420.

Here, the City describes its decision as occurring on August

2, 1999 when the Salem City Council adopted the 12th Street
Safety Promenade Master Plan.  Plaintiff does not dispute this
choice was made by City Council which had authority to make such
decisions.  Plaintiff, however, argues the City did not consider
protective devices that would have warned the plaintiff or
protect the general public when it failed to take into account
specific warning devices for pedestrians.

I disagree.  In 1998, staff from the Oregon Department of
Transportation, Land Conservation and Development, and the City
met to find a solution to the numerous pedestrian accidents that
were occurring at the section of 12th Street between Mill and
Marion Streets.  Def. City of Salem's Memo., Ex. 2, pp. 1.  A
master plan was developed with a recommended engineering solution
to "construct a pedestrian promenade on the frontage road system
and install a railing along the east side of the railroad right-
of-way."  Id.  The Salem City Council adopted the master plan on
August 2, 1999.  Def. City of Salem's Memo., Ex. 3, pp. 10.

Staff and the City Council made a choice between various
projects and proposals to mitigate the potential for future
railroad fatalities occurring along 12th Street.  The City
Council chose to adopt a plan that included construction of a
promenade and a railing.  Plaintiff does not contend the design
or specifications of the pedestrian promenade or railing was
defective or that a city employee constructed the railing
Page 42 - OPINION AND ORDER

negligently.   Plaintiff argues instead that the City failed to consider specific warning devices for pedestrians.   The City, however, in adopting the master plan on August 2, 1999, had determined the proposed solution would provide all the desirable safety features.

Plaintiff also contends that the City has not met its burden in determining that this choice and decision was one that involved public policy.   Plaintiff argues the Public Utility Commission ("PUC") Order, dated March 24, 1989, was the original policy decision that developed safety procedures for the Crossing.   Def. City of Salem's Memo., Ex. 4.   As such, plaintiff seems to contend the master plan was not a public policy decision.   Again, I disagree.   A judgment involving public policy generally must take place at a relatively high level of public authority and does not include routine day-to-day decisions.   Ramirez, 179 Or. App. at 420.   The master plan was developed over many months through various state staff agencies and was eventually adopted by the City Council, which had the authority to make such decisions.   Thus, the plan to construct a pedestrian promenade and a railing along 12th Street was a public policy decision.

The City has met its burden in establishing the affirmative defense of discretionary immunity.   Therefore, defendant City's motion for summary judgment is granted.

CONCLUSION

Defendant City's motion for summary judgment (doc. 34) is granted.  Railroad defendants' motion for summary judgment (doc. 35) is granted in part and denied in part as follows: railroad defendants' motions regarding plaintiff's negligence claims for defendants' excessive speed, failure to issue a slow order, failure to warn, and inadequate warning devices are granted; railroad defendants' motions regarding plaintiff's negligence claims for defendants' failure to provide adequate visibility, failure to eliminate a dangerous condition, and failure to maintain a proper lookout are denied.  In addition, railroad defendants' motions to strike (doc. 61) are denied.

IT IS SO ORDERED.

Dated this 4th day of April 2008.

_____
Ann Aiken
United States District Judge

[1] Complete preemption occurs when a federal law is so dominant in a particular area that it "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."  Chapman v. Lab One, 390 F.3d 620, 625 (8th Cir. 2004) (internal citations omitted).  The U.S. Supreme Court has limited those situations to areas of law such as the Labor Management Relations Act or the Employee Retirement Security Act of 1974.  Id. at 629.

Page 44 - OPINION AND ORDER

<sup>2</sup> The court in <u>Anderson</u> also noted that a track classification is not changed unless either a federal or state track inspector orders to lower the classification or imposes a speed restriction.  327 F.Supp.2d at 976 n.6.  In addition, "[i]f a railroad fails to maintain track so as to meet the proper standards, it is subject to a penalty *** but <u>federal preemption is not lost unless the FRA track inspector downgrades a track</u>." (emphasis added) (internal citation omitted).  <u>Id.</u>

<sup>3</sup> (3)(i) Adequate warning devices, under Sec. 646.214(b) or any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

    (A) Multiple main line railroad tracks.

    (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

    (C) High speed train operation combined with limited sight distance at either single or multiple track crossings.

    (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E)  Either a high volume of vehicular traffic, high
number of train movements, substantial numbers of school
buses or trucks carrying hazardous materials, unusually
restricted sight distance, continuing accident occurrences,
or any combination of these conditions

(F)  A diagnostic team recommends them. ...

[4] (4) For crossings where the requirements of ~ 646.214(b)(3)
are not applicable, the type of warning device to be
installed, whether the determination is made by a State
regulatory agency, State highway agency, and/or the
railroad, is subject to the approval of FHWA [Federal
Highway Administration].

[5] Defendants contend that ORS 810.210 and 824.202 stand as
"independent authority for preemption, unequivocally vesting
the exclusive authority over the placement and adequacy of
crossing signalization in ODOT, usurping any common law duty
that the railroad may have had before the enactment of ORS
810.210 and ORS 824.202."  Railroad Defendant's Reply Memo.,
pp. 29-30.

ORS 810.210. Placement and control of traffic control devices.

(1) The Oregon Transportation Commission is vested with exclusive jurisdiction over the installation at railroad-highway grade crossing of signs, signals, gates, protective devices or any other device to warn or protect the public at a railroad-highway crossing. The commission is granted exclusive authority under this subsection to determine the character or type of device to be used.

ORS 824.202. Policy; authority vested in state and department.

It is the policy of this state to achieve uniform and coordinated regulation of railroad-highway crossings and to eliminate crossings at grade wherever possible. To these ends, authority to control and regulation the construction, alteration, and protection of railroad-highway crossings is vested exclusively in the state, and in the Department of Transportation as provided in ORS 824.200 and 824.256.